UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 13-cr-280 (DWF/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Dylan Wesley Stately, | |
| Defendant. | |

This matter came before the undersigned United States Magistrate Judge upon the parties' pretrial motions. This case has been referred to the undersigned Magistrate Judge for report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on January 8, 2014, regarding the parties' pretrial discovery motions,[1] Defendant Dylan Wesley Stately's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 24], and Defendant's Motion to Suppress Evidence Obtained as Result of Search and Seizure, [Docket No. 25]. For reasons discussed below, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 24], be **GRANTED in part** and **DENIED in part**, and that Defendant's Motion to Suppress Evidence Obtained as Result of Search and Seizure, [Docket No. 25], be **DENIED**.

I.  **BACKGROUND AND STATEMENT OF FACTS**[2]

   A.  **Background**

---

[1] The Court addressed the parties' discovery motions in a separate Order, [Docket No. 35].
[2] The facts are derived from the January 8, 2014, testimony of Red Lake Police Department Canine Officer Dominic Hamre, Red Lake Police Sergeant Harlan Johnson, and Government Exhibits 1-3.

Defendant is charged with one count of robbery, one count of assault with a dangerous weapon, and one count of assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 2, 113(a)(3), 113(a)(6), 1151, 1153(a), and 2111.

On January 2, 2014, the Court continued the motion hearing to January 8, 2014, at the parties' joint request. As a result, the parties agreed to present their arguments to the Court orally on January 8, 2014, waiving submission of supplemental post-hearing briefing. (Joint Letter to Magistrate Judge [Docket No. 32]). The Court held a motion hearing on January 8, 2014, at which time Docket Numbers 24 and 25 were taken under advisement.

**B.      Facts**

In the early morning hours of July 5, 2013, Red Lake Police Canine Officer Dominic Hamre was patrolling and answering calls on the Red Lake Indian Reservation. At approximately 4:15 a.m., Canine Officer Hamre overheard an all-unit dispatch reporting shots fired in the Bartons Camp residential area of the reservation. Canine Officer Hamre immediately responded to the call and began heading west to the Bartons area.

En route, Canine Officer Hamre overheard, via police radio, that Red Lake Police Sergeant Harlan Johnson – who was also patrolling the reservation that morning – was already in the Bartons Camp area when the shots fired dispatch went out, that he had arrived on-scene, and that he had located three .45-calibre shell casings on the side of the road near Shirrel Barron's residence in the Bartons area. Sergeant Johnson further advised, over the radio, that he had spoken with a female at the scene, Ashley Cobenais, who witnessed a dark-colored Dodge Intrepid leaving the area immediately following the shots fired report. Ms. Cobenais did not report witnessing shots fired.

First on-scene, Sergeant Johnson immediately began searching the vicinity for signs of a dark Intrepid. However, he saw no vehicles in the area of Shirrel Barron's home at that time. When Canine Officer Hamre arrived on-scene a short time later, he, too, immediately began looking for a dark-colored Intrepid in the immediate vicinity of the shots fired report. Canine Officer Hamre did not see any other vehicles on the road when traveling to the Bartons area. Three Red Lake Police Department officers were in the area by this time: Canine Officer Hamre, Sergeant Johnson, and Corporal Branchaud.

Shortly after arriving on-scene, Canine Officer Hamre overheard another all-units dispatch reporting a dark-colored Intrepid spotted approximately three to four houses down from Shirrel Barron's residence. At the time, neither Canine Officer Hamre nor Sergeant Johnson knew who had made the call to dispatch reporting the suspect vehicle sighting, but police later learned that it was the same female with whom Sergeant Johnson had spoken upon arriving at the shots fired scene, approximately ten to fifteen minutes earlier.

Canine Officer Hamre proceeded to the location dispatch reported, in pursuit of the dark-colored Intrepid. After spotting the vehicle on the road near its reported location, Canine Officer Hamre approached the vehicle and confirmed that it was a dark-colored Intrepid. Canine Officer Hamre radioed-in the license plate number and followed the vehicle. Corporal Branchaud was parked immediately near-by and pulled-out behind Canine Officer Hamre when he began following the Intrepid.

About 30 seconds later, the suspect vehicle failed to use its turn signal when turning westbound onto Walking Shield Road/Highway 89, and Canine Officer Hamre activated his lights and sirens and initiated a felony traffic stop, with Sergeant Johnson and Corporal Branchaud joining. The vehicle complied, and Canine Officer Hamre began giving instructions

to the four male individuals inside the suspect vehicle over the patrol's P.A. system, with his weapon drawn and pointed towards the ground.

In accordance with Red Lake Police training regarding felony stops, Canine Officer Hamre ordered the driver, later identified as the Defendant, to throw the vehicle's keys out the window, and for all four individuals to place their hands on the interior roof of the vehicle. One at a time, the individuals were ordered from the suspect vehicle and onto their stomachs on the ground. As the individuals emerged from the vehicle, its doors were left open. The officers handcuffed the four males. No conversations took place at this time.

When the officers ran down the names of the four males, the officers discovered that two of the passengers had outstanding tribal warrants. Corporal Branchaud took these two individuals in for booking. Regarding the remaining two males, Sergeant Johnson took Defendant, handcuffed, to his squad car, and the final passenger, later identified as P.S., was secured in Canine Officer Hamre's squad.

When escorting Defendant, handcuffed, to his patrol vehicle, Sergeant Johnson advised Defendant, the driver of the suspect vehicle, that he was being detained, and asked him if there were any weapons in the vehicle. Defendant replied there were none. This exchange may be identified as the first conversation that took place between Sergeant Johnson and Defendant.

After securing Defendant in the back of his patrol car, Sergeant Johnson returned to the suspect vehicle, and, while observing the vehicle from the outside, he observed a blood-like substance on the interior of the vehicle, and what appeared to be a white t-shirt covered in a blood-like substance, in plain view. Sergeant Johnson returned to his squad car and asked Defendant – who was still handcuffed and secured in the back of the patrol – for his consent to search the vehicle, its trunk, and the glove box. Defendant gave Sergeant Johnson consent to

4

search the vehicle by verbally replying "yes" or "yeah." Sergeant Johnson testified that Defendant, by all appearances, fully understood what Sergeant Johnson was asking. No evidence suggests that Defendant was incapacitated in any way, nor is there any evidence that Defendant was under the influence of any drugs or alcohol. Defendant had not yet been read <u>Miranda</u> warnings. Although Sergeant Johnson did not advise Defendant that he had the option to refuse to provide consent, Sergeant Johnson did not make any threats or promises, nor did he tell Defendant that if he did not consent to the search his vehicle would be towed and Defendant would be walking home.

Sergeant Johnson advised Canine Officer Hamre, and radioed-in for the purpose of keeping a record of the consent, that the driver of the vehicle, Defendant, had consented to a search of the vehicle.

Canine Officer Hamre testified that he observed a wet, blood-like substance through the window of the vehicle, on the inside of the back passenger side door. Canine Officer Hamre also observed a bloody t-shirt and a bloody cellphone in the vehicle.

In searching the vehicle, Sergeant Johnson located two firearms – both .45-calibre – in the glove box of the suspect vehicle and advised Canine Officer Hamre to call a Red Lake Police Department crime scene team.

As Sergeant Johnson searched the vehicle, Canine Officer Hamre overheard over the police radio that another Red Lake Police officer was with an assault victim in another area of the reservation. The victim described his assailants as driving a dark colored vehicle. Canine Officer Hamre testified that at the time these events were unfolding, he began making a connection between the shots fired suspects and the assault reported over the radio. However,

Sergeant Johnson testified that at that time, he had not yet connected the felony stop with the reported assault.

Following the search of the vehicle, Sergeant Johnson spoke with Defendant a third time, asking him whether he had any knowledge of the guns discovered in the vehicle or the assault that had been reported. Defendant – again, still handcuffed and secured in the back of the patrol – denied knowledge of both the guns and the assault.

After processing the scene and taking photographs, Sergeant Johnson spoke with Defendant a fourth time. Sergeant Johnson sat in the front seat of his squad, with Defendant still handcuffed in back. Sergeant Johnson asked Defendant about the guns. Defendant answered that he did not know that the guns were in the vehicle, and he speculated that his girlfriend could have put them in there. During this conversation, Defendant eventually admitted to firing a gun near the lake near Shirrel Barron's house in the Bartons area. He also admitted to being in the Redby Lagoon area earlier, the area in which the reported assault took place. Defendant went on to admit that P.S. – a passenger in the Intrepid – assaulted an individual, and that Defendant had attempted to help the victim. Sergeant Johnson arrested Defendant for discharge of a firearm and handling of a dangerous weapon (both crimes on the reservation). Sergeant Johnson advised Defendant that he was officially under arrest and read Defendant his <u>Miranda</u> rights. Sergeant Johnson drove Defendant to the Red Lake Detention Center and booked him into custody.

In general, Sergeant Johnson testified that during these conversations, Defendant was cooperative, did not yell, and appeared to fully understand the questions and his answers. Sergeant Johnson made no promises and/or threats, nor did he engage in any other coercive behavior.

Upon arriving at the Red Lake Detention Center, Sergeant Johnson noticed blood on Defendant's shoes. Without prompting, Defendant stated that the blood got there when he was attempting to assist the assault victim.

Canine Officer Hamre estimates that the total amount of time that transpired between the initial shots fired dispatch and the traffic stop was approximately twenty-five to thirty minutes.

## II.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS, [DOCKET NO. 24]

Defendant moves the Court for an order suppressing all statements, admissions, and answers made by Defendant prior to, and at the time of or subsequent to, his arrest. (Def.'s Mot. to Suppress [Docket No. 24]). Specifically, Defendant contends that the statements were (1) derived from unconstitutional, custodial interrogation, (2) made without the assistance of counsel, in violation of the Fifth and Sixth Amendments, and (3) not given voluntarily, knowingly, and intelligently. (Id.)

At the January 8, 2014, motion hearing, the Government was unable to produce FBI Special Agent Joe Ogden, who interviewed Defendant after he was booked into the Red Lake Detention Center. As a result, the Government represented on the record that it will not use the statements obtained by SA Ogden in its case in chief at trial; these statements are not the subject of the present motion.[3]

As the record currently exists before the Court, five exchanges between Defendant and Sergeant Johnson are at issue with regard to the present motion, [Docket No. 24]: (1) the initial exchange regarding whether there were weapons in the suspect vehicle; (2) the second exchange in which Defendant was asked for consent to the search of the suspect vehicle; (3) the third

---

[3] However, the Government explicitly stated that it does not concede any constitutional errors with regard to these statements.

exchange in which Defendant denies knowledge of the weapons and the reported assault; (4) the fourth exchange in which Defendant admits to firing a gun near Shirrel Barron's home, among other things; and (5) Defendant's statement at the Red Lake Detention Center in which he explains that blood got on his shoes when he was attempting to assist the assault victim.

All five exchanges unequivocally took place while Defendant was in custody. Prior to making any statements whatsoever, Defendant was handcuffed, informed that he was being detained by police, and, for all statements save the first, secured in the back of a squad car and, later, arrested and booked into the Red Lake Detention Center. As a result, the Court need not consider whether Defendant was in custody at the time he made the subject statements. Rather, the Court focuses its inquiry on whether the subject statements were the product of a custodial interrogation so as to require Miranda warnings.

### A.      Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). However, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

A custodial interrogation is one that "involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action

in any significant way." Miranda, 384 U.S. at 444. Interrogation is defined as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

In Miranda v. Arizona, the United States Supreme Court carved-out an exception to Miranda for general on-the-scene questioning by law enforcement:

> Our decision is not intended to hamper the traditional function of police officers in investigating crime. See Escobedo v. State of Illinois, 378 U.S. 478, 492, 84 S. Ct. 1758, 1765 [(1964)]. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

Miranda, 384 U.S. at 477-78. "Miranda does not apply to these on-the-scene investigative efforts because the individuals being questioned are not in custody at all and there is no coercive atmosphere." United States v. Thomas, No. 12-cr-128 (MJD/JJK), 2012 WL 6812536, at *8 (D. Minn. Dec. 19, 2012) (citing Miranda, 384 U.S. at 477).

**B.     Analysis**

At the January 8, 2014, motion hearing, the Government conceded on the record that Defendant should have been read Miranda warnings "sooner," specifically with regard to exchanges three and four with Sergeant Johnson, as Defendant was undisputedly subjected to custodial interrogation. However, the Government maintains that the substance of exchanges one

and two are nevertheless admissible as (1) the first exchange constitutes general on-the-scene questioning and is thus excepted from Miranda, and (2) the second exchange in which Defendant gave officers consent to search the vehicle does not constitute a "statement" procured pursuant to custodial interrogation.

### 1.    First Exchange – Question Regarding Weapons in the Vehicle

There is no question that Defendant was "in custody" for the purposes of Miranda during this initial exchange between Sergeant Johnson and Defendant, as Sergeant Johnson had handcuffed Defendant, advised him that he was being detained, and was in the process of leading him to his squad car to be secured.[4] Thus, the Court considers whether Sergeant Johnson's question was interrogative, and thus requiring of Miranda.

This first exchange between Defendant and Sergeant Johnson, in which Sergeant Johnson asked Defendant whether there were any weapons in the vehicle, does not qualify as "general on-the-scene" questioning Miranda envisioned as exempted from its reach. In United States v. Thomas, this District recognized that general on-the-scene questioning is typically unencumbered by custody and is typically directed at bystanders and other citizens from whom law enforcement officers hope to gather facts regarding what transpired:

> This case involves a coercive pressure on a restrained individual's will that is fundamentally different than the non-coercive atmosphere when an officer meets with citizens on the street or in their homes to ask questions as part of the fact-gathering process of investigation. An officer asking "What happened," "What is going on," and "What was the rope for" to a handcuffed inmate he is taking to a segregated housing unit within the prison as part of the institution's disciplinary procedures in response to a prison fight is

---

[4] "Miranda warnings are required only where a person's freedom has been so restricted as to render him 'in custody.'" United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006). In Martinez, the Eighth Circuit held that, under a totality of the circumstances analysis, a defendant who had been handcuffed and advised that he was being further detained constituted "in custody" for the purposes of Miranda, as a reasonable person would not, considering the totality of the circumstances, feel he was at liberty to stop the questioning and leave. Id. at 909. "Martinez's freedom was restricted to a degree often associated with formal arrest, and we find he was in custody at the time he was handcuffed." Id.

> fundamentally different from a police officer who responds to a
> call and then asks unrestrained citizens what they know about a
> suspected crime.

2012 WL 6812536, at *8. As in <u>Thomas</u>, Sergeant Johnson's question to Defendant regarding whether there were any weapons in the suspect vehicle was both (1) directed at an individual who was unequivocally in custody, and (2) potentially made to illicit an incriminating statement. Moments before this first exchange, Defendant had been ordered to the ground, handcuffed, and was in the process of being escorted by Sergeant Johnson to his squad car. The atmosphere of this first exchange was far from the non-coercive atmosphere <u>Miranda</u> envisioned for general on-the-scene questioning.

Rather, Sergeant Johnson's question may be considered interrogative. The pointed question concerning the presence of weapons in the vehicle constitutes "express questioning or its functional equivalent" by law enforcement, which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Innis</u>, 446 U.S. at 301. The Court has a difficult time reaching the conclusion that the question was meant to do anything other than garner a potentially incriminating response from Defendant. The question was not benign, nor was it purely meant to secure officer safety, as all occupants of the vehicle had been handcuffed and secured by this time.

Because Defendant was in custody and because Sergeant Johnson's question regarding the presence of weapons in the vehicle was not a general on-the-scene question but rather a interrogative question likely to elicit an incriminating response from Defendant, Defendant should have been read <u>Miranda</u> warnings. In the absence of <u>Miranda</u> warnings, Defendant's statement in the first exchange was procured in violation of his Fifth Amendment rights, and the

Court recommends **GRANTING** Defendant's Motion to Suppress, [Docket No. 24] with respect to the first exchange.

### 2.      Second Exchange – Consent to Search the Vehicle

As with the first exchange, there is no question that Defendant was "in custody" for the purposes of <u>Miranda</u> during the second exchange between Sergeant Johnson and Defendant, as Sergeant Johnson had handcuffed Defendant, advised him that he was being detained, and secured him in the back of his patrol vehicle. Thus, the Court considers whether the exchange was interrogative, and thus requiring a warning compliant with <u>Miranda</u>.

Consent to search "statements" are traditionally evaluated within the context of the Fourth Amendment and in terms of whether or not such consent was voluntarily given/procured.[5] <u>See, e.g.</u>, <u>United States v. Burns</u>, No. 13-cr-15(2) (DWF/LIB), 2013 WL 1811323 (D. Minn. Apr. 11, 2013). "Statements" providing consent are not typically evaluated within the context of the Fifth Amendment and/or motions to suppress statements, as such "statements" are not statements so much as they are expressions of consent.

Accordingly, the second exchange between Defendant and Sergeant Johnson was not a product of a custodial interrogation because Sergeant Johnson's question concerning Defendant's consent to search the vehicle was not "likely to illicit an incriminating response." <u>See</u> Section II.A, <u>supra</u>. <u>See, e.g.</u>, <u>United States v. Fleck</u>, 413 F.3d 883, 892-893 (8th Cir. 2005) (holding that even if defendants were in custody at the time they were asked to consent to the search of their home, the police request for a key to a locked bedroom did not constitute "interrogation" as would trigger a defendant's right to <u>Miranda</u> warnings; such a question was not the kind of investigative questioning designed to elicit an incriminating response).

---

[5] The "voluntariness" of Defendant's consent will be evaluated in the context of the Fourth Amendment in the next section, regarding Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 25].

Because the topic of consent involved in the second exchange does not constitute interrogation, law enforcement officers were not required to read Defendant his <u>Miranda</u> rights. As a result, the Court recommends **DENYING** Defendant's Motion to Suppress, [Docket No. 24], with respect to the second exchange.

### 3.      Third and Fourth Exchanges – Custodial Interrogations

Again, there is no question that Defendant was "in custody" for the purposes of <u>Miranda</u> during the third and fourth exchanges between Sergeant Johnson and Defendant, as Sergeant Johnson had handcuffed Defendant, advised him that he was being detained, and secured him in the back of his patrol vehicle. Similarly, there is no question that the nature of the questioning was interrogative. Sergeant Johnson's questions, which included questions concerning the weapons found in the suspect vehicle and the reported assault, were unequivocally likely to illicit incriminating responses from Defendant.

As articulated above, "[<u>Miranda</u>] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." <u>Chipps</u>, 410 F.3d at 445. Because Defendant was not read <u>Miranda</u> warnings prior to custodial interrogation, the Court recommends **GRANTING** Defendant's Motion to Suppress, [Docket No. 24], with respect to exchanges three and four.

### 4.      Fifth Statement – Red Lake Detention Center

Finally, although there is no question that Defendant was "in custody" for the purposes of <u>Miranda</u> when he was arrested and while in the process of being booked into the Red Lake Detention Center, the fifth statement was not the product of custodial interrogation. Thus, although Defendant was <u>Mirandized</u> prior to making this statement, the Court need not consider

13

whether he voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights because the statement was not the product of police interrogation.

The record currently before the Court indicates that Defendant's statements concerning the blood on his shoes at the Red Lake Detention Center were not prompted by any specific police questioning. Absent any evidence that Defendant was interrogated by officers regarding the blood on his shoes, nothing in the record indicates that Defendant's fifth statement was anything but a voluntarily, spontaneous remark. <u>See</u> <u>Innis</u>, 446 U.S. at 300 (holding that a defendant's statements were not the product of custodial interrogation simply because officers were talking near the defendant while the defendant was in custody; "This is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. As the Court in <u>Miranda</u> noted, 'Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . .* Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." <u>Miranda</u>, 384 U.S. at 478 (emphasis added)."). <u>See also</u> <u>United States v. Shannon</u>, No. 06-cr-6 (JNE/JJG), 2006 WL 1579852, at *3 (D. Minn. Jun. 1, 2006) (holding that the defendant's statements, made while in custody, were spontaneous, unprovoked by officers, and therefore not requiring of suppression); <u>United States v. Ochoa-Gonzalez</u>, 598 F.3d 1033, 1039 (8th Cir. 2010) (holding that the defendant's voluntary statements during booking after being arrested were voluntary, not in response to interrogation, and thus admissible).

14

As a result, the Court recommends **DENYING** Defendant's Motion to Suppress, [Docket No. 24], with respect to this fifth statement.

## III.   DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE, [DOCKET NO. 25]

Defendant moves the Court for an order suppressing all physical evidence obtained as a result of the search and seizure executed by Red Lake Police on or about July 5, 2013. (Def.'s Mot. to Suppress [Docket No. 25]). Specifically, Defendant argues that (1) the traffic stop of Defendant's vehicle was not supported by either probable cause or reasonable suspicion, (2) the subsequent search of the vehicle was conducted without a warrant, without probable cause, without consent, and without any exigent circumstances, and (3) any subsequent evidence seized as a result of the unlawful stop/search constitutes "fruit of the poisonous tree" requiring suppression.

### A.   Standard of Review

The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV.

### 1.   Traffic Stops

"A traffic stop constitutes a 'seizure' within the meaning of the Fourth Amendment." United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)). The principles of Terry v. Ohio, 392 U.S. 1 (1968), govern traffic stops. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). "Generally, a traffic stop must be supported by at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring." United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004); see also United States v.

Cortez, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). "[T]he standard employed is less demanding than the standard of probable cause that governs arrests and full-scale Fourth Amendment searches, both with respect to the amount of supporting information that is required to establish reasonable suspicion and with respect to the degree of reliability that the information must exhibit." United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002) (citing Alabama v. White, 496 U.S. 325, 330 (1990)); see, e.g., United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007).

Courts have refused to create a "finely-tuned standard" or "a neat set of legal rules" as to what constitutes reasonable, articulable suspicion. Ornelas v. United States, 517 U.S. 690, 696, 703 (1996). Therefore, the standard remains an "elusive concept." Cortez, 449 U.S. at 417. As such, reasonable suspicion justifying a traffic stop may be found when the "totality of the circumstances" demonstrates that the detaining officer had a "particularized and objective basis for suspecting legal wrongdoing." Jones, 606 F.3d at 966. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Stewart, 632 F.3d 453, 457 (8th Cir. 2011) (quoting Cortez, 449 U.S. at 418).

## 2.    Warrantless Searches

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). "Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to search is

a well-recognized exception to the warrant requirement." United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010). "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002) (internal quotations omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." United States v. Williams, 521 F.3d 902, 906 (8th Cir. 2008).

Importantly, consent must be voluntarily given.[6] "Whether or not the consent was voluntary must be established by examining the totality of the circumstances, including both the characteristics of the accused and the details of the interrogation." United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000) (internal quotations and citations omitted). In the Eighth Circuit:

> We consider the following characteristics of the individual to determine whether their consent was truly voluntary: age, intelligence, intoxication, advice of Miranda rights, and previous arrests. We also consider the following characteristics of the environment in which the individual's consent was given, so as to determine whether their consent was truly voluntary: length of detention, threats and misrepresentations by police, whether the individual is in custody or under arrest, whether it is a public or private place, and the suspect's contemporaneous objections and representations.

United States v. Reinholz, 245 F.3d 765, 780 (8th Cir. 2001) (internal citations omitted).

---

[6] "The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would jeopardize their basic validity. Just as was true with confessions, the requirement of a 'voluntary' consent reflects a fair accommodation of the constitutional requirements involved. In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of 'voluntariness.'" Schneckloth v. Bustamonte, 412 U.S. 218, 229, 93 S. Ct. 2041, 2048-49, 36 L. Ed. 2d 854 (1973).

**B.     Analysis**

**1.     Traffic Stop**

Evaluating the totality of the circumstances, law enforcement had reasonable, articulable suspicion that criminal activity had occurred sufficient to justify the traffic stop of Defendant's vehicle in the early hours of July 5, 2013.

First, immediately after overhearing the shots fired dispatch, Sergeant Johnson proceeded to the scene and discovered three .45-calibre shell casings outside Shirrel Barron's residence, the alleged scene of the shots fired call. This immediately suggested that a crime had taken place in the Bartons Camp area of the reservation, as reported via dispatch.

Second, a witness at the scene of the shots fired call <u>immediately</u> provided law enforcement with a description of a vehicle spotted in the area of the shots fired report: a dark-colored Dodge Intrepid. When evaluating the officers' reasonable, articulable suspicion, the Court may consider "the temporal and geographic proximity of [a] car to the scene of the crime, the matching description of the vehicle, and the time of the stop." <u>United States v. Juvenile TK</u>, 134 F.3d 889, 903 (8th Cir. 1998). The involvement of a dark-colored Intrepid would be corroborated by Canine Officer Hamre, as he observed a dark-colored Intrepid in the area of the shots fired soon after arriving on-scene. Furthermore, no officers reported seeing any other vehicles in the vicinity of the shots fired report, narrowing the likelihood of another vehicle's involvement in the shots fired incident. At each point in time as the incident unfolded, the involvement of a dark-colored Intrepid in the commission of a crime was time and again corroborated and provided law enforcement with reasonable suspicion sufficient to justify a stop of the suspect vehicle.

Most significantly, the described events – from the initial shots fired report, to the officer's arrival on-scene in the Bartons area, to the discovery of shell casings, to discussions with the female witness, to the tracking and pursuit of the dark-colored Intrepid, to the subsequent felony stop – happened in short order, if not contemporaneously. Officers reacted and responded immediately each step of the way and followed "in progress" leads. Red Lake officers were aware of a shots fired call. Having been advised by an on-scene witness that a dark-colored Intrepid was seen leaving the scene of the shots fired call, and having been advised by dispatch as to where a dark-color Intrepid had recently been spotted, Canine Officer Hamre proceeded to the location, spotted a vehicle matching the description provided by the on-scene witness and via dispatch, and initiated a traffic stop shortly thereafter.[7]

The totality of the circumstances indicates that the officers had a particularized and objective basis for suspecting the stopped vehicle of criminal activity. As such, the officers had the requisite reasonable suspicion to initiate a traffic stop.

However, as articulated in the statement of facts, above, the Red Lake officers did not execute a simple Terry stop, but rather executed what Canine Officer Hamre and Sergeant Johnson referred to as a "felony stop." Nevertheless, the officers were justified in their actions.

"After stopping a vehicle, an officer is 'entitled to conduct an investigation reasonably related in scope to the circumstances that prompted it.'" United States v. Rosas, No. 11-cr-188 (RHK/SER), 2011 WL 7046028, at *7 (D. Minn. Nov. 23, 2011) (citing United States v. Collier,

---

[7] The Court recognizes that Canine Officer Hamre initiated the traffic stop only after the vehicle committed a traffic violation (failure to use turn signal, ostensibly a crime on the Red Lake Indian Reservation). However, the Court finds that the reasonable, articulable suspicion that criminal activity occurred as associated with the shots fired call provides even stronger support for the traffic stop. "[S]o long as police have probable cause to believe that a traffic violation has occurred, the stop is valid. . . ." United States v. Rosas, No. 11-cr-188 (RHK/SER), 2011 WL 7046028 (D. Minn. Nov. 23, 2011), report and recommendation adopted in part, No. 11-cr-188 (RHK/SER), 2012 WL 124970 (D. Minn. Jan. 17, 2012) (citing United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996); see United States v. Olivera–Mendez, 484 F.3d 505, 509 (8th Cir. 2007) (allowing officers to stop a vehicle if the officer(s) have probable cause that a traffic violation occurred)).

419 Fed. Appx. 682, 684 (8th Cir. 2011) (internal citations omitted)). Given the circumstances that prompted the traffic stop – namely, reason to believe that the vehicle was involved in a shots fired report, and that, as such, weapons may be on board – the officers reasonably engaged in a "felony" traffic stop, necessary for their own protection and in proportion to the nature of the suspected criminal activity. During any investigative stop, "officers may take steps reasonably necessary to protect their personal safety." United States v. Shranklen, 315 F.3d 959, 961 (8th Cir. 2003). In light of the nature of the suspected crime of shots fired, as well as the possibility of firearms inside the vehicle, the officers' actions were reasonably necessary to maintain the status quo, protect the officers, and allow them to conduct a stop of the vehicle immediately and without interference. See United States v. Navarrete–Barron, 192 F.3d 786, 791 (8th Cir. 1999) (holding officers' actions of drawing firearms while approaching defendant's vehicle, handcuffing vehicle's occupants, and placing them in a police unit were reasonable given officers' reasonable suspicion the vehicle's occupants "had been or were engaged in drug trafficking, which very often is accompanied by dangerous weapons"); Bell, 480 F.3d at 864 (holding that officers' conduct in drawing their weapons and ordering defendant out of the vehicle and onto the ground, handcuffing him, and detaining him were justified and did not exceed the legitimate bounds of the stop in light of the suspected crime of possessing stolen firearms).

Because the officers had reasonable, articulable suspicion that criminal activity had occurred, and because they had a particularized and objective basis for suspecting the Dodge Intrepid was involved in the wrongdoing and initiating a felony traffic stop, the Court recommends **DENYING** Defendant's Motion to Suppress, [Docket No. 25], with respect to the traffic stop.

2.      **Warrantless Search of the Vehicle**

Defendant gave Sergeant Johnson express, voluntary consent to search the vehicle, the trunk, and the glove box.[8]

As discussed above, the question of whether Defendant's consent to search was in fact voluntary is a question of fact determined by the totality of the circumstances. Schneckloth, 412 U.S. at 227. The Court evaluates Defendant's express consent to search in light of the Eight Circuit factors enumerated above. See Section III.A.2. "These factors should not be applied mechanically, because '[t]he concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules.' Nevertheless, the factors are valuable as a guide to analysis." United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990) (citing Sokolow, 109 S. Ct. at 1585 (internal citations omitted)).

The record indicates that Defendant was fully capable of rendering voluntary consent to search the vehicle. Defendant, by all appearances, understood what Sergeant Johnson was asking of him. Defendant was of the age of majority and did not have any difficulty speaking or understanding English. Nothing in the record indicates that Defendant's intelligence was such that it rendered him incapable of providing consent. The record indicates that there were no signs that Defendant was under the influence of any drugs or alcohol, or that he was experiencing any other mental or physical impairment.

The fact that Defendant was not Mirandized prior to giving consent is not determinative in the present case. "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Schneckloth, 412 U.S. at 227.

---

[8] Defendant, as the driver of the vehicle, had the authority to consent to a search of the vehicle. See United States v. Chavez Loya, 528 F.3d 546, 554 (8th Cir. 2008); United States v. Vargas-Miranda, 559 F. Supp. 2d 1016, 1019 (D. Neb. 2008).

In <u>Chaidez</u>, the record before the court contained no indication that law enforcement had told the defendant of his right to withhold consent; in fact, the defendant even testified that he thought that he did <u>not</u> have the right to refuse to authorize the search. 906 F.2d at 381. However, the court held that while this is a significant factor for courts to consider in examining the voluntariness of a consent to search, the factor is not determinative:

> When Chaidez consented to the search, he was sitting in [a police officer's] car on the shoulder of a public highway during the day. Because even persons who have been arrested and are in custody can voluntarily consent to a search, we do not believe that the setting for Chaidez's consent was unduly coercive. . . . In <u>Velasquez</u>, an individual who had been stopped for a traffic violation and was sitting in a police car consented to a search of her car. The Third Circuit "perceive[d] no coercion or overreaching" on those facts, and the court explicitly observed that "[t]he consent took place on the shoulder of a major highway during daylight hours."

<u>Id.</u> at 382 (internal citations omitted).

As in <u>Chaidez</u>, the Court finds that Defendant's personal circumstances were not so unduly coercive so as to render his consent to search involuntary. Although Defendant was in custody at the time and had not been <u>Mirandized</u> or otherwise informed of his right to refuse consent, the record indicates that he, by all indications, gave his consent to search entirely voluntarily.

With regard to the characteristics of the environment, the Court likewise finds that none of the Eighth Circuit factors suggest that Defendant's consent was involuntary. The record before the Court indicates that Defendant had been detained in the back of Sergeant Johnson's squad car for only a few minutes before Sergeant Johnson asked for Defendant's consent to search, and there is certainly no evidence to suggest that he was detained for so long a time as to be coercive. Furthermore, no evidence in the record indicates that any law enforcement officers made any

threats or promises to obtain Defendant's consent. Defendant was in custody in a <u>public</u> place off the side of a public road (as in <u>Chaidez</u>), and Defendant expressed no objections nor did he make any representations indicating that he was otherwise unwilling to consent to the search of the vehicle.

The totality of the circumstances indicates that Defendant's consent to search the vehicle was voluntarily given, and, as a result, all evidence obtained as a result thereof was lawfully seized. The Court thus recommends **DENYING** Defendant's Motion to Suppress, [Docket No. 25], with regard to the search of Defendant's vehicle.

## IV.      CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED**:

1. That Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 24], is **GRANTED in part** and **DENIED in part**, as set forth above; and

2. That Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 25], is **DENIED**, as set forth above.


Dated: January 22, 2014                                      s/Leo I. Brisbois
                                                             The Honorable Leo I. Brisbois
                                                             U.S. Magistrate Judge


## N O T I C E

Upon the request of both parties, this Court continued the motion hearing one week. Consequently, and in light of the pending trial date of February 24, 2014, the Court now finds it must reduce the time that the parties are allowed to file, and to respond to, objections to this Report and Recommendation.

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 29, 2014**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections by **February 5, 2014, or within seven days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.